IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ICEUTICA PTY LTD and<br>IROKO PHARMACEUTICALS, LLC,<br><br>  Plaintiffs,<br><br>  v.<br><br>LUPIN LIMITED and LUPIN<br>PHARMACEUTICALS, INC.,<br><br>  Defendants. | C. A. No. 14-1515 (SLR-SRF) |

**DECLARATION OF CORY J. BERKLAND, PH.D. IN SUPPORT OF PLAINTIFFS'
REPLY CLAIM CONSTRUCTION BRIEF**

I, Cory J. Berkland, Ph.D., declare as follows:

1.  I submit this declaration in support of Plaintiffs iCeutica Pty Ltd and Iroko Pharmaceuticals, LLC's Reply Claim Construction Brief. I have personal knowledge of the matters set forth in this declaration and, if called upon as a witness, I could competently testify to the truth of each statement in this declaration.

**I.   BACKGROUND AND QUALIFICATIONS**

2.  I am a currently a Professor of Pharmaceutical Chemistry and a Professor of Chemical and Petroleum Engineering at The University of Kansas. I have an appointment as a courtesy professor in the Chemistry Department. I have also assisted in designing the BioEngineering graduate program at The University of Kansas and am formerly the director of the Biomolecular Engineering track within the BioEngineering program.

3.  I received a Doctor of Philosophy degree from the University of Illinois in 2003 and a Master of Science degree from the University of Illinois in 2001, both from the

Department of Chemical and Biomolecular Engineering. I received a Bachelor of Science degree from Iowa State University Department of Chemical Engineering in 1998. A copy of my curriculum vitae is attached as Exhibit A.

4. I have worked in the area of pharmaceutical formulation for 15 years. I am experienced in the practice of pharmaceutical formulation and drug delivery. A significant portion of my career has been dedicated to the study of engineered particles, in particular aspects relating to particle size and surface chemistry. I currently research processes for controlling the attributes of particles on the micro- and nano-scale. I have extensive experience in the area of pharmaceutical nanoparticulates and related theories, processing, formulation, and analysis.

5. I have published approximately 125 peer-reviewed papers and I have presented my research at many national and international research conferences and to companies, including more than 50 invited talks. I have given distinguished lectures such as the Nagai Foundation Distinguished Lectureship in Japan and a lectureship at the Center of Excellence in Nanotechnology at the Massachusetts Institute of Technology. I serve or have served on the editorial advisory board for a number of peer-reviewed journals: *Therapeutic Delivery, The Journal of Pharmaceutical Sciences,* and *The Journal of Pharmaceutical Innovation*. I also serve on advisory boards for the Drug Discovery and Development of Experimental Therapeutics program and the National Institutes of Health Pharmaceutical Aspects of Biotechnology training grant program at The University of Kansas.

6. I have received funding for my research from the National Institutes of Health, the National Science Foundation, the Department of Defense, the Defense Threat Reduction Agency, the PhRMA Foundation, the Coulter Foundation, the American Heart Association, the Cystic Fibrosis Foundation, the Juvenile Diabetes Research Foundation, several other philanthropic organizations, and multiple pharmaceutical companies.

7. I am an active participant in a number of professional societies including the American Institute of Chemical Engineers, the Controlled Release Society, the American Chemical Society, and the American Association of Pharmaceutical Scientists. I have also been elected Fellow of the American Institute for Medical and Biological Engineering.

8. I have received numerous awards in recognition of research, including the Controlled Release Society Young Investigator Award and the Coulter Translational Research Award. At The University of Kansas, I have received major research awards such as the University Scholarly Achievement Award, Jim Baxendale Commercialization Award, Leading Light Award, Miller Professional Development Award for Research, and I was named a Bellows Scholar in the School of Engineering at The University of Kansas. I have also received the W.T. Kemper Fellowship for teaching excellence at The University of Kansas.

9. I have been granted multiple patents and have co-founded three companies; Orbis Biosciences, Savara Pharmaceuticals, and Orion BioScience. I have held executive positions at each of these companies. I am currently the Chief Scientific Officer, member of the Board of Directors, and Chair of the Scientific Advisory Board at Orbis Biosciences. I am also currently the Chairman of the Board of Directors at Orion BioScience. I have worked as a consultant in the pharmaceutical industry providing formulation advice to multiple major pharmaceutical and biotechnology companies. I have also worked at one of the top three Biotechnology investment firms, Sofinnova Ventures, during a six month sabbatical in 2014.

10. I have been retained by Fish & Richardson P.C. as an expert witness for Plaintiffs iCeutica Pty Ltd and Iroko Pharmaceuticals, LLC in this litigation. I am being compensated for the services I render in this case at an hourly rate of $500 per hour plus expenses. My compensation is in no way based on the outcome of this litigation.

11. In the last four years, I have testified as an expert at trial and by deposition in the following matters: AstraZeneca v. Apotex Corp., Civil Action No. 01 Civ. 9351(DLC)

(S.D.N.Y); Baxter Healthcare S.A. v. HQ Specialty Pharma Corp., Civil Action No. 2:13-cv-06228 (D.N.J.); Par Pharms., Inc. v. TWi Pharms. Inc., Civil Action No. CCB-11-2466 (D. Md.); Fournier Pharma Inc. v. The Minister of Health, Federal Court of Canada, Docket: T-1184-10.

12. The opinions I have expressed in this report are based on the materials identified in the attached Exhibit B as well as my general knowledge, education, and experience.

## II. PATENTS-IN-SUIT

13. I understand that the present litigation involves a dispute between Plaintiffs and defendants Lupin Limited and Lupin Pharmaceuticals, Inc. (together, "Defendants") about U.S. Patent Nos. 8,679,544 (the "'544 patent"); 8,999,387 (the "'387 patent"); and 9,017,721 (the "'721 patent") (together, the "patents-in-suit").

14. The claims of the '544 and '721 patents generally relate to a unit dose of a pharmaceutical composition containing either 18 mg or 35 mg of diclofenac acid, wherein the diclofenac acid has a specific particle size, and the diclofenac acid has a specific dissolution rate when tested under prescribed conditions. Claim 1 of the '544 patent is representative:

> 1. A unit dose of a pharmaceutical composition containing 18 mg of diclofenac acid and comprising lactose monohydrate and sodium lauryl sulfate wherein the particles of diclofenac acid have a median particle size on a volume average basis of less than 500 nm and greater than 25 nm, wherein the unit dose when tested in vitro by USP Apparatus I (Basket) method of U.S. Pharmacopoeia at 100 rpm at 37° C. in 900 ml of 0.05% sodium lauryl sulfate in citric acid solution buffered to pH 5.75 has a dissolution rate of diclofenac acid such that at least 91%, by weight, is released by 45 minutes.

15. The claims of the '387 patent generally relate to methods of treating pain by administering a unit dose of a pharmaceutical composition containing either 18 mg or 35 mg of diclofenac acid, wherein the diclofenac acid has a specific particle size, and the diclofenac acid has a specific dissolution rate when tested under prescribed conditions. Claim 1 of the ''387 patent is representative:

4

> 1. A method for treating pain comprising administering a solid oral unit dose of a pharmaceutical composition containing 18 mg of diclofenac acid, wherein the diclofenac acid has a median particle size, on a volume average basis, of less than 1000 nm and greater than 25 nm, wherein the unit dose, when tested in vitro by USP Apparatus I (Basket) method of U.S. Pharmacopoeia at 100 rpm, at 37° C. in 900 ml of 0.05% sodium lauryl sulfate in citric acid solution buffered to pH 5.75, has a dissolution rate of diclofenac acid such that at least 94%, by weight, is released by 75 minutes.

16. I understand that the patents-in-suit share a common specification, which I have reviewed. I will cite to the '544 patent's specification in this declaration.

### III. LEGAL PRINICIPLES AND LEVEL OF ORDINARY SKILL IN THE ART

17. In expressing opinions on what I understand might be considered to be legal issues, I have applied the following legal standards conveyed to me by Plaintiffs' counsel.

18. I understand from Plaintiffs' counsel that terms in patent claims must be read as they would have been understood by a person of ordinary skill in the art at the relevant time period. I have been advised by Plaintiffs' counsel that the relevant time period is 2009-2010.

19. Based on my review of the claims of the patents-in-suit and their shared specification, it is my opinion that a person of ordinary skill in the art to which the inventions pertain is someone who has an M.S. or Ph.D. in pharmaceutics, chemical engineering, chemistry, or closely related field, with three or more years of experience in developing oral drug compositions and delivery systems. Practical experience can be substituted for a M.S. or Ph.D. degree. The practical experience could have been obtained in either industry or academia. In either of these settings, the person may also work in collaboration with other scientists and clinicians, to consult with on formulation, bioavailability, clinical and analytical testing.

20. I understand from Plaintiffs' counsel that a claim is indefinite when the claims, read in light of the specification and prosecution history, fail to inform skilled artisans with reasonable certainty about the scope of the invention.

5

### IV. "MEDIAN PARTICLE SIZE, ON A VOLUME AVERAGE BASIS"

21. I understand that the parties dispute the meaning of the claim term "median particle size, on a volume average basis."

22. I understand that Plaintiffs have proposed construing this term as: "The particle size diameter that divides the population in half such that 50% of the population is greater than or less than said particle size diameter as determined on an equivalent spherical particle volume basis measured after particle size reduction or when preparing the unit dose." (*See* ECF No. 63.)

23. I also understand that Defendants have proposed separately construing "median particle size" and "volume average basis."

24. I understand Defendants have proposed construing "median particle size" as: "The particle diameter, determined on an equivalent spherical particle volume basis, that divides the population in half such that 50% of the population is greater than or less than this size." (*See* ECF No. 63.)

25. I understand Defendants have not proposed a construction of "volume average basis," but instead have asserted that this term is indefinite. (*See* ECF No. 63.)

26. I have been asked to comment on how a person of ordinary skill in the art would understand the claim term "median particle size, on a volume average basis."

27. The specification contains a discussion of particle size and particle size testing at columns 21-23 and includes an example related to particle size measurements at column 44.

28. The specification correctly explains that there are a range of techniques that can be used to determine particle size. ('544 patent at 21:28-29.) It goes on to explain two primary techniques: (1) photon correlation spectroscopy also known as dynamic light scattering, and (2) laser diffraction. (*Id.* at 38-50.)

29. The specification includes a definition for "median particle size," which the specification correlates with measurements made using a laser diffraction instrument. (*Id.* at 22:1-10.) That definition reads:

> For measurements made using a laser diffraction instrument, or an equivalent method known in the art, the term "median particle size" is defined as the median particle diameter as determined on an equivalent spherical particle volume basis. Where the term median is used, it is understood to describe the particle size that divides the population in half such that 50% of the population is greater than or less than this size. The median particle size is often written as D50, D(0.50) or D[0.5] or similar. As used herein D50, D(0.50) or D[0.5] or similar shall be taken to mean 'median particle size'.

30. Based on the claim language, which uses the phrase "median particle size," and this definition in the specification, skilled artisans reading the claims would understand that it requires that the recited "median particle size" be determined using a laser diffraction instrument. I understand that Defendants' expert, Dr. Amiji, has reached the same conclusion. (Amiji Decl., ¶ 58.)

31. The specification also includes procedures on how particle size measurements can be completed using a laser diffraction instrument. The particle size measurement example at column 44 states as follows:

> Particle Size Measurement:
> The particle size distribution (PSD) was determined using a Malvern Mastersizer 2000 fitted with a Malvern Hydro 2000S pump unit. Measurement settings used: Measurement Time: 12 seconds, Measurement cycles: 3. Final result generated by averaging the 3 measurements. Samples were prepared by adding 200 mg of milled material to 5.0 mL of 1% PVP in 10 mM hydrochloric acid (HCl), vortexing for 1 min and then sonicating. From this suspension enough was added into the dispersant (10 mM HCl) to attain a desired obscuration level. If necessary an extra 1-2 minutes of sonication was applied using the internal sonication probe in the measurement cell. The refractive index of the active ingredient to be measured was in the range of 1.49-1.73. Any variations to this general method are summarized in Table B.

('544 patent, 44:8-22.)

32. The example uses a Malvern Mastersizer instrument, which skilled artisans would have understood in 2009-2010 is capable of determining particle size on a volume basis by laser diffraction.

33. Skilled artisans would understand this technique acquires laser diffraction data during a time frame referred to as a measurement cycle. During measurement, laser diffraction data are collected, converted to particle sizes, and averaged, for example.

34. In addition, the example indicates that the final result is generated by averaging the data gathered from three measurement cycles. Consistent with this, skilled artisans would have understood in 2009-2010 that particle sizes are typically determined by averaging the data captured over multiple measurement cycles.

35. I have reviewed a user manual for a Malvern Mastersizer 2000 instrument that would have been available to skilled artisans as of 2009-2010. The user manual from 2007, which is available online, is attached hereto as Exhibit C ("2007 User Manual").

36. The 2007 User Manual provides an overview of how the Malvern Mastersizer can be used to make particle size measurements. In brief, (1) the sample is prepared and placed into a sample holder in the machine; (2) measurements are taken to capture the light scattering pattern of the sample; and (3) the machine's software analyzes the raw data. (Ex. C. at 2-2 to -3.)

37. Regarding the measurement step, the 2007 User Manual explains that the measurement step involves a "detector array," which is made up of many individual detectors, taking "snapshots" of the sample's scattering pattern. (Ex. C at 2-2.) The Manual explains that a given snapshot "only captures the scattering pattern from the particles that are passing through the analyser laser beam at that particular time." (Ex. C at 2-3.) Because of this, it explains that "[t]aking only one snapshot may not give a representative reading of the scattering pattern," and so the instrument "takes many snapshots (known as snaps) and averages the result." (Ex. C at 2-3.)

38. Regarding the analysis step, the 2007 User Manual explains the raw averaged snapshot data is analyzed by the Malvern software, which can display the resulting information in various ways. (Ex. C at 2-3, 5-1.) The primary result displayed is the relative distribution of volume of particles. (Ex. C at 6-2, 6-10.) The volume of particles is measured by mathematical equations that presume the particles have an equivalent spherical shape. (Ex. C at 6-11.) Once a relative volume distribution has been generated, statistics regarding the distribution can be calculated. (Ex. C at 6-2.) A standard statistic calculated from the relative volume distribution is the median of the volume distribution, which can be illustrated as D(v, 0.5). (Ex. C at 6-5.) The median of the volume distribution represents the particle size "at which 50% of the sample is smaller and 50% is larger." (Ex. C at 6-5.)

39. For the reasons described herein, in my opinion, a skilled artisan would have understood the scope of the claim language "median particle size, on a volume average basis" with reasonable certainty upon reviewing the claims and the specification of the patents-in-suit, and in conjunction with their general knowledge and understanding of particle size measurements and instrumentation.

## V. EXAMPLE 14 OF THE PATENTS-IN-SUIT

40. I have been asked to identify the composition of the 18 mg and 35 mg diclofenac nanoformulation capsules tested in Example 14 of the patents-in-suit.

41. Example 14 reports the dissolution rate of 18 mg and 35 mg formulations disclosed in Examples 13(a) and 13(b). ('544 Patent, 54:16-18.) Examples 13(a) and 13(b) describe the manufacture of diclofenac nanoformulation capsules by first making wet granules and then filling them into capsules. ('544 Patent, 52:57-54:9)

42. The wet granules produced in Example 13(a) were made by using "milled powder (666.2 g, from Example 9, Sample W.) The wet granules produced in Example 13 (b) were

made by using milled powder from either Example 9, Sample X or Example 9, Sample Y.  ('544 Patent, 53:36-37, 53:48-49.)

43.     Example 9 in turn refers to Figures 9A-B ('544 Patent, 50:17-20), which are charts depicting various milled powders.  (*See* '544 patent, Sheets 15-16.)  I have reviewed Samples W-Y in Figure 9B of the specification, and each contains 15% diclofenac acid by weight, 84% lactose by weight, and 1% SDS (or sodium lauryl sulfate) by weight.

44.     Examples 13(a) and 13(b) disclose that to make the nanoformulations tested in Example 14, the milled powders from Samples W-Y in Figure 9B are further processed by the addition of a 30% w/w povidone K30 solution and subsequent drying.  ('544 Patent, 52:66-53:13)  The resultant dried granules contain diclofenac acid, sodium lauryl sulfate, lactose and povidone.  The addition of the povidone during granulation alters the weight composition of Samples W-Y as described in Figure 9B.  A skilled artisan would understand that with the addition of povidone K30, the weight percentages of both lactose monohydrate and sodium lauryl sulfate in the nanoforulations tested in Example 14 to be less than 84% w/w and 1% w/w, respectively.  The diclofenac acid capsules tested in Example 14 therefore contain diclofenac acid, <84% lactose monohydrate, <1% sodium lauryl sulfate, and povidone.

45.     This declaration is based on my study of the information available to me at the time of its writing.  My review and consideration of the patents-in-suit, their claims, and the other materials discussed in this Declaration are ongoing.  As my analysis continues, I may identify additional evidence supporting the opinions that I have summarized in this Declaration. I reserve the opportunity to update, supplement, or amend this Declaration in view of further analysis or additional information that might be obtained or become available at a later time or to address new or different positions taken by Defendants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 29, 2015 at Indianapolis, Indiana.

_____
Cory J. Berkland, Ph.D.